UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| KENNETH BOATMAN d/b/a BOATMAN AUTOMOTIVE, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) | No. 3:17-CV-536-PLR-HBG |
| | ) | |
| COMCAST OF THE SOUTH, L.P., and COMCAST OF THE SOUTH, | ) ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM AND ORDER</u>

This case is before the undersigned pursuant to 28 U.S.C. § 636, the Rules of this Court, and Standing Order 13-02.

Now before the Court are the following Motions: (1) Plaintiff's Motion in Limine to Exclude Terry Orr [Doc. 72]; (2) Plaintiff's Motion in Limine to Exclude Richard Green and Supplemented Motion [Docs. 74, 75], (3) Plaintiff's Motion in Limine to Exclude Tracey Bellamy [Doc. 83]; (4) Plaintiff's Motion in Limine to Exclude Harold Detherage and Donald Hoffman [Doc. 85]; (5) Defendants' Motion in Limine to Exclude Roger Goins [Doc. 90]; (6) Defendants' Motion in Limine to Exclude Scott Huggins and Kenneth Boatman [Doc. 92]; (7) Defendants' Motion in Limine to Exclude Carl Lundin [Doc. 94]; (8) Defendants' Motion in Limine to Exclude Tim Dunn [Doc. 96]; and Defendants' Motion to Strike Dunn's Expert Reports [Doc. 98].[1]

The Court held a hearing pursuant to *Daubert v. Merrell Dow Pharma., Inc.*, 509 U.S. 579, 589 (1993) on November 4, 2019.    Attorney Luis Bustamante appeared on behalf of Plaintiff.

---

[1] The Court notes that [Doc. 98] was filed as a brief in support of Defendants' Motion in Limine to Exclude Tim Dunn [96].  The brief, however, requested that the Court strike Tim Dunn's report pursuant to Federal Rule of Civil Procedure 37.  Thus, the Court will treat [Doc. 98] as a motion.

Attorneys Christian Laycock and William Johnson appeared on behalf of Defendants. During the *Daubert* hearing, the Court also heard testimony from Tim Dunn, Donald Hoffman, Roger Goins, and Carl Lundin. Accordingly, for the reasons stated below, the Court **GRANTS IN PART** Plaintiff's Motions [**Docs. 72, 83**], **DENIES AS MOOT** Plaintiff's Motion in Limine to Exclude Richard Green and the Supplemented Motion [**Docs. 74, 75**], Defendants' Motion in Limine to Exclude Scott Huggins and Kenneth Boatman [**Doc. 92**], and Defendants' Motion to Strike Dunn's Expert Reports [**Doc. 98**] and **DENIES** all remaining Motions [**Docs. 85, 90, 94 and 96**].

## I.      BACKGROUND

The Complaint in this case was filed on December 15, 2017, and later amended on April 16, 2018. [Doc. 20]. The Amended Complaint states Plaintiff was the owner and operator of an automotive repair and restoration shop in Knoxville, Tennessee. [*Id.* at ¶ 7]. On June 16, 2017, Defendants' installer, Blake Hearn ("Hearn"), arrived at Plaintiff's facility to install internet, television, and make telephone upgrades. [*Id.* at ¶ 11]. During the course of installation, Hearn informed Plaintiff that a much larger cable would need to be installed from the road into the office area due to the lack of a signal strength. [*Id.*]. Hearn drilled a new, large hole for the cable to enter from outside the building into the upstairs breakroom. [*Id.*]. After drilling the larger hole for the service cable to be installed, the installer placed a new modem within the office area, hooked up the equipment, and advised Plaintiff that the installation was complete. [*Id.*].

Three days later, on June 19, 2017, Plaintiff received a telephone call from a 911 dispatcher indicating that the building was on fire and that the fire department has responded to a slow, smoldering fire. [*Id.* at ¶ 13]. The fire had consumed a major portion of the structure, destroying the contents of Plaintiff's business operations and causing a total and/or partial loss of numerous vehicles that were in the process of restoration. [*Id.*]. Plaintiff alleges that he sustained property

losses, including leasehold improvements, contents, business interruption, loss of work in progress and is subject to the imposition of damages due to the loss of customers' property. [*Id.* at ¶ 14].

The Amended Complaint alleges that the fire loss and damages were proximately caused by Defendants' negligence through the acts and/or omissions of its installer. [*Id.* at ¶ 16]. Specifically, the Amended Complaint states that Defendants' cable installation included the operation of drilling through metal into a combustible wall space, which by definition constitutes "hot work." [*Id.*]. The Amended Complaint alleges a number of negligent acts, including actions that are contrary to the National Fire Protection Association 51B, "Standard for Fire Protection During Welding, Cutting, and Other Hot Work." [*Id.*].

## II.    SUMMARY OF THE TESTIMONY

The following experts testified at the *Daubert* hearing: Tim Dunn, Donald Hoffman, Roger Goins, and Carl Lundin. A summary of their testimony follows.

### A.    Tim Dunn

Tim Dunn is a professional engineer and a certified fire and explosion investigator, retained by Plaintiff. Dunn opines that the fire in Boatman Automotive likely started in the upstairs storage closet above the office and was the result of hot work associated with the RG-11 cable installation by the Comcast technician. [Doc. 96-3 at 8].

During the *Daubert* hearing, Dunn testified that he is a chemical engineer, specializing in the forensic field of fires, explosions, and other incidents that are related to fuel gases. He is board certified with the National Association of Forensic Engineers and is licensed as a registered professional engineer in several states. In conducting investigations, he follows the National Fire Protection Association ("NFPA") 921. He followed NFPA 921 in this case, including the scientific method with which the NFPA 921 adopts. He explained his investigation as follows:

> Well, as an overview, I visited the site on first – on July 6, 2017. And I made an inspection, evaluated the damages, looked at the various aspects of the fire to determine an origin where the fire started and a cause for the fire. Then afterwards, there has been previous investigators present. I spoke with them on the phone on July 11, I believe that was Captain Whitaker of the Knoxville Fire Department. And also Anthony Fultz, another investigator, independent investigator. I returned to the site on [August] 10, as I recall of 2017. There was a joint inspection.

He also interviewed Plaintiff, Plaintiff's daughter, and Gerald Johnson, the witness who contacted dispatch. Based on the information Dunn gathered, he opines that the break room had burned and collapsed and that there were flames inside the office area, which was directly below the break room. He also testified that in the course of his investigations, he utilized certain publications, including NFPA 51B, which pertains to hot work, the NFPA fire journal, and a Tennessee statute. He also reviewed documents from Defendants, including instructions that pertain to the installation of the cable.

Dunn testified that the drilling that occurred is considered hot work and that the heat and sparks created by the drilling can cause a fire or an explosion. He stated that he did not need to perform any testing and that in his experience, drilling through steel can cause sparks and elevated heat. He stated that he considered other various causes of the fire pursuant to NFPA 921. For example, he considered lightning strikes, but he was able to determine that there were no lightning strikes within the proximity of the building. He stated that he was able to reconstruct the area where the fire occurred using photographs and conversations with Sammy Dyer.[2] Dunn testified that the hole in the wall was caused by drilling because of the smooth, finished edge.

In addition, Dunn testified he reviewed photographs and remnants of the building to determine the extent of the heat that had been generated during the fire. He explained that there

---

[2] Sammy Dyer was Plaintiff's employee, who testified that he heard Hearn drilling "ten, twelve, fifteen minutes." [Doc. 85-6 at 2]. He testified that Hearn did not drill continuously. [*Id.*].

were gaps in the roof as a result of the fire and that the walls had buckled, especially the upper wall section directly against the break room storage space.  There was also buckling downstairs in the office area from the exterior siding.  Dunn stated that there was comparable damage to the exterior door frame and the door.

Dunn testified that he was able to determine an approximate temperature of the fire.  He testified that steel will not melt in a normal fire and that the fire has to be over 2000º before steel will melt.  He explained that steel will show buckling under 2000º, but it will melt at 2600º to 2700º Fahrenheit.  He explained that aluminum melts between 900º to 1100º.  He opines that the fire inside the office was approximately 1600º to 1800º Fahrenheit.

Dunn testified that he did not do any arc mapping.  He explained that arc mapping means examining the wiring itself or any of the electrical activity to determine whether there are any signs of arcing.  He explained that it is a tool to determine where the fire initiated, and it sometimes provides a good point of reference as to where the fire extended.  Here, Dunn testified that he examined the wiring in the office area downstairs and saw that the circuit was still in place, and he also examined the overhead wiring in the upstairs bream room.  He testified that he found no signs of electrical arcing.  He testified that he did find possible electrical arcing at a junction box, which was part of the wiring circuit that supplied the outdoor light.  The wiring was where the hot work had occurred.  He also spoke with Captain Whitaker and Anthony Fultz, who both inspected the building, and they did not believe the fire to be of electrical origin.

Dunn testified that the main tenant for hot work is trying to avoid it and that in this case, hot work could have been avoided by splicing the RG11 cable outside.  Dunn stated that he also examined the door and opined that it had been forced open by the load that was exerted by the weight of the building once it began to feel the strain of the fire and with the buckling from the

walls that occurred.  He stated that the evidence was consistent with the door being mechanically forced opened from the load exerted on it.  The door also matched the bowing that was part of the door frame and the mechanical damage on the door hinges.

Dunn stated that he did not believe that the fire was incendiary.  He stated that no samples of ignitable liquid had been collected and that Captain Whitaker and Anthony Fultz did not find any electrical evidence.  Dunn stated that he arrived at a different conclusion than Captain Whitaker and Anthony Fultz.  Dunn believes that the fire started upstairs in the closet.  He disagreed that the fire started downstairs, explaining that there was a water heater and plastic tubing that did not show any fire damage.  Dunn testified that in his opinion, the smoldering fire was caused by drilling through steel and wood and that the sawdust nestled into the insulation.  He said according to the NFPA 921, a smoldering fire is unpredictable; and it cannot be found, especially within a sandwiched wall; and that it can take its own time with respect to turning into a flaming fire.

On cross examination, Dunn testified that Captain Whitaker and Anthony Fultz disagree with him regarding the origin of the fire.  He testified that the temperature of the fragments would have had to been over 400º Fahrenheit.  He did not test to determine the temperature.  He said that the fragments would not get any hotter and that they would cool.

With respect to the door, Dunn stated that his theory is that the hasp unrolled due to the pressure put on it from the load above the door.  He does not have any information regarding the weight of the load or what it would take for the hasp to unfurl.  He stated that he does not know how much load was on the door or how much it would take to bow the door.  He explained that it was a combination of the weight of the building and the tensile strength being lost from the temperature of the fire.  He acknowledged that he is not a structural engineer.  He explained that

he evaluated the physical evidence to reach his conclusion regarding the door. Dunn testified that if the ceiling were still intact in the office, that would lead him to think that the fire was in the office and not upstairs.

On re-direct examination, Dunn testified that he participated in a telephone call with several firefighters and no one mentioned in the meeting that the ceiling had collapsed before they arrived.

### B.    Donald Hoffman

Donald Hoffman, Ph.D., ("Dr. Hoffman") is a senior scientist with Safety Engineering Laboratories, Inc., a professional engineer, and a certified fire investigator. [Doc. 85-1. at 9]. Defendants retained Dr. Hoffman to perform a scientific and engineering analysis of the fire. [*Id.*].

During the *Daubert* hearing, Dr. Hoffman testified that he has been investigating the cause and origin of fires since 1988. Dr. Hoffman stated that an engineering analysis of a fire uses math and science to analyze a fire, the progress of the fire, and the growth spread to determine origin and/or cause.[3]

With respect to his tests, Dr. Hoffman explained that he did not use the siding from Plaintiff's building because there was not enough siding to test. With respect to the material, he explained that he used a 26-gauge siding attached to a wood frame. He then placed a target of paper underneath the siding and proceeded to drill multiple holes using a thermal imaging camera to demonstrate that the drilling of the steel siding would not produce particles that could ignite. He explained that the 26-gauge siding is consistent with the 26-gauge steel on the building that he measured during the artifact inspection.

---

[3] During the hearing, Dr. Hoffman testified what he learned during his scene inspection. Plaintiff's Motion, however, only raises challenges to the testing conducted by Dr. Hoffman. Therefore, the Court will not summarize this portion of his testimony.

With respect to the size of the drill bit, Dr. Hoffman testified that he used a larger drill bit to generate more heat. He further testified that the diameter of the drill bit does not materially impact the testing and that a bigger drill bit only created a fifteen-degree temperature difference, which is insufficient to generate the heat needed to start a fire. He further testified that ambient temperatures of the testing area did not impact his determination that the drilling was not a competent ignition source. He explained, "Commonly what we do for ambient temperatures is we can take Delta, which means if you're ten degrees higher, you add ten degrees to your results. It's the same result. If it's ten degrees lower than what you tested at, you subtract ten degrees. In any case, we're hundreds of degrees off, not tens of degrees, so it doesn't matter."

With respect to the sharpness of the drill bit, Dr. Hoffman stated that he took that into consideration and that a sharper drill bit generates additional and larger wood particles. Dr. Hoffman stated that the testing was done using a worst case scenario design.

On cross examination, Dr. Hoffman disagreed that the material he used for testing was different than the sheet metal siding on Boatman's Automotive. Dr. Hoffman explained that the minimum thickness that the 26-gauge sheet of metal can be is .0187. He agreed that the size of the drill bit he used was not a three-eighth inch drill bit and that he did not get a sample drill bit from Comcast. Dr. Hoffman testified that it is possible that it could take more effort to drill through the same piece of metal with a dull drill bit. He testified that it is reasonable to think that the longer someone drills the higher temperature it will generate. He stated, however, that there is a limit on the temperature that can be generated and dissipated. The purpose of his testing was to determine that limit. He testified that he did not drill for five to fifteen minutes because such a drilling time is inconsistent with the physical evidence. He determined that drilling is not a competent thermal source.

Dr. Hoffman testified that in his experience, drilling does not cause sparks. He stated that he has used a drill, and it has caused sparks in certain metals but not on sheet metal siding. In this case, he explained, "We drilled it multiple times using a drill under multiple scenarios to try to get the temperatures as high as we could under multiple conditions of drilling, including increasing the temperature of the drill. It doesn't come anywhere near the temperature of the drill. It doesn't come anywhere near the temperature you need for the ignition source of wood." He explained that he tested according to the conditions that he was aware of and which were consistent with the physical evidence and the data. He explained, "And we recorded it under the worst-case scenario to try and determine the temperatures. We correlated that with the ignition temperatures of wood. It's nowhere near the ignition temperature of wood. Not a competent ignition source."

With respect to how long he drilled, Dr. Hoffman acknowledged that he did not drill for five to fifteen minutes because this time range is inconsistent with the evidence. Dr. Hoffman testified that in his second test, he drilled through metal, insulation, and a wood board. He did not drill through the OSB board because the drill bit does not get anywhere near the temperature to ignite the OSB board, and no one recalls how the drilling was performed. He continued, "I measured the maximum temperatures that you could get on the drill and the drill bit and the drilling particles and found them to be way below the ignition temperature of sawdust or wood." He testified that from his testing, there were particles in the insulation, but not enough sawdust to spread or ignite a fire. He testified that his tests demonstrate that NFPA 51B does not apply. He explained that NFPA 51B recognizes sparks from welding and cutting but not for solid combustible woods similar to wood here.

## C.    Roger Goins

Roger Goins ("Goins") is a Certified Public Account ("CPA"), who Plaintiff retained to provide an opinion on damages, including future loss profits. Specifically, Goins concludes that the net adjusted loss from the fire is $100,253. [Doc. 90-3 at 3]. He then makes projections that had there been no fire, Plaintiff's revenue would have increased within the range of $31,191 (2%) to $37,228 (5%). [*Id.*].

During the *Daubert* hearing, Goins testified that he had filed Plaintiff's taxes for several years, including 2016 through 2018. He testified that he does not audit the information but relies on Plaintiff to provide accurate details. Because Plaintiff operates a sole proprietorship, the primary source of information is the Plaintiff. He testified that in arriving at his opinion in this case, he reviewed financial statements from January 1, 2016, through the date of the fire; reviewed tax returns; reviewed the detailed general ledger; met with Plaintiff and his daughter (who is in charge of the books and records); and utilized a service that performs analytical work on various companies. In rendering his opinions, Goins testified as follows:

> First thing I did was took a look at the 18-month ended June of 2017, gross volume at that time was $427,507. I divided that number by 18, came up with $23,750. I used that as my monthly projected income base for the next 18 months. Then going on down the financial statement, the costs of goods sold. The cost of goods sold at average 52.93 percent in 18 months prior to the fire. The period after the fire, the costs of goods sold were up substantially. After talking to Mr. Boatman, that was due to the loss of so many different things he accumulated over the years he was in business. There was fuel, there was – there was—or lubricants and oils, belts, bolts, different parts. So I didn't want to overstate the losses after the fire, so I adjusted costs of goods sold down to 52.93 percent, included in cost of goods sold were the costs of his materials and supplies, costs of cars he purchased to refurbish along with his outside services, which were things he was unable to do, like alignments and transmission rebuilding.

> Then I asked both of them if there might be any items included
> before or after the fire that were personal in nature that really
> weren't ordinary and necessary for the business to operate. Ms. Ford
> said she would go back and check. She came up with a schedule.
> She gave me the schedule. I had those items removed.

He further explained that in removing such items, he wanted to make certain that all the expenses were true expenses of the company. He testified that his 2% to 5% range of increased revenue was conservative and supported by the data of various industries, which state that the North American automotive repair industry would increase at a cumulative growth rate of 5.8%. Further, Goins testified that the 2016 tax return was incorrect and that he planned to amend the tax return, even though he is not required to amend. He explained that when preparing the 2016 tax return, he used the sales tax returns instead of the profit and loss statement. Goins testified that in making his projections in this case, he used the correct numbers.

###    D.    Carl Lundin

Carl Lundin, Ph.D., is a professor of metallurgy at the University of Tennessee, who Plaintiff retained to provide an opinion as to whether drilling occurred on the outside steel sheet wall from Plaintiff's business. Later, Dr. Lundin served a rebuttal report [Doc. 94-4], concluding as follows:

> [T]he damage to the subject door was strongly influenced by
> temperature and the loading of the doorframe caused by heating
> conditions interior to the building during the fire, causing the door
> to be breached by the conditions inherent with the fire and that the
> door was not breached from the outside before the fire started.
> Furthermore, the doorframe deformation was caused by the nature
> of the fire and the softening of the steel components inherent with
> the temperature increase.

[*Id.* at 5].[4]

---

[4] Defendants only challenge Dr. Lundin's later opinion.

During the *Daubert* hearing, Dr. Lundin testified that he is a professor in the material science and engineering department. He testified that with respect to the material science, the heart and substance of what he does is to examine load factors, tensile strength, and how heat or cold affects the properties of the material. Dr. Lundin testified that he inspected the remains of the door, the hinges, the locking mechanism, and the hasp. He obtained photographs and also read the depositions of the firefighters and Defendants' employees. With respect to the range of the fire's temperature, Dr. Lundin relies on Tim Dunn, who opined that the temperature was between 1,000° and 1,800° Fahrenheit. He testified that Dunn's opinion is consistent with what he (Dr. Lundin) observed in the photographs. He also utilized articles that discussed a material's strength at certain temperatures. Dr. Lundin did not have access to the scene because it had already been demolished prior to him getting involved.

Dr. Lundin testified that the door frame and the door are steel. At the bottom of the door, the temperature did not exceed 1,000° Fahrenheit because 1,000° Fahrenheit is the melting temperature for alumni alloys. Dr. Lundin also explained the damage in a number of items and structures in several photographs. He testified that he did not perform any testing to make his determinations because the damage was visual and easy to account. He testified that the scientific literature also supports his opinions with respect to what the building experienced during the fire. He stated that he did not need to do any physical testing. He testified that he has experience with respect to loading factors (i.e., the door, the door frame, girt, and beams). He stated that he regularly looks at loading factors but typically on other components other than doors and frames. He stated, however, that the principles with metals and distortion are the same.

On cross examination, Dr. Lundin testified that he is not a structural engineer and that he was not sure how many pounds per square inch was created by the downward pressure. He does

not know the value that the hasp would have to endure before it failed. He testified that he did not

do any testing on the hasp, he did not do any calculations as to the weight put on the door frame,

and he did not know the weight of the girt beams. On re-direct examination, Dr. Lundin testified

that he did not need to know the weight or load of the beams.

## III.    STANDARD OF REVIEW

"Federal Rule of Evidence 702 obligates judges to ensure that any scientific testimony or

evidence admitted is relevant and reliable." *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137,

147 (1999) (quoting *Daubert v. Merrell Dow Pharma., Inc.*, 509 U.S. 579, 589 (1993)).

Specifically, Rule 702 provides as follows:

> A witness who is qualified as an expert by knowledge, skill,
> experience, training, or education may testify in the form of an
> opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge
>     will help the trier of fact to understand the evidence or to
>     determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods;
>     and
>
> (d) the expert has reliably applied the principles and methods to the
>     facts of the case.

Fed. R. Evid. 702.

In *Daubert,* the Supreme Court of the United States stated that a district court, when

evaluating evidence proffered under Rule 702, must act as a gatekeeper, ensuring "that any and all

scientific testimony or evidence admitted is not only relevant, but reliable." 509 U.S. at 589. The

*Daubert* standard "attempts to strike a balance between a liberal admissibility standard for relevant

evidence on the one hand and the need to exclude misleading 'junk science' on the other." *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 176–77 (6th Cir. 2009).

The factors relevant in evaluating the reliability of the testimony, include: "whether a method is testable, whether it has been subjected to peer review, the rate of error associated with the methodology, and whether the method is generally accepted within the scientific community." *Coffey v. Dowley Mfg., Inc.*, 187 F. Supp. 2d 958, 970-71 (M.D. Tenn. 2002) (citing *Daubert*, 509 U.S. at 593–94). Rule 702 inquiry as "a flexible one," and the *Daubert* factors do not constitute a definitive checklist or test. *Kumho Tire Co.*, 526 U.S. at 138-39 (citing *Daubert*, 509 U.S. at 593); *see also Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 152 (3d Cir. 1999) (explaining that these factors "are simply useful signposts, not dispositive hurdles that a party must overcome in order to have expert testimony admitted"). "[A] party must show, by a 'preponderance of proof,' that the witness will testify in a manner that will ultimately assist the trier of fact in understanding and resolving the factual issues involved in the case." *Coffey*, 187 F. Supp. 2d at 70-71 (quoting *Daubert*, 509 U.S. at 593-94). The party offering the expert has the burden of proving admissibility. *Daubert,* 509 U.S. at 592 n. 10.

Finally, "the court will not exclude expert testimony merely because the factual bases for an expert's opinion are weak." *Andler v. Clear Channel Broad., Inc.*, 670 F.3d 717, 729 (6th Cir. 2012) (quotation marks and citations omitted). Exclusion is the exception, not the rule, and "the gatekeeping function established by *Daubert* was never 'intended to serve as a replacement for the adversary system.'" *Daniels v. Erie Ins. Group*, 291 F. Supp. 3d 835, 840 (M.D. Tenn. Dec. 4, 2017) (quoting *Rose v. Matrixx Initiatives, Inc.*, No. 07–2404–JPM/tmp, 2009 WL 902311, at *7 (W.D. Tenn. March 31, 2009)) (other quotations omitted). Rather, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional

and appropriate means of attacking shaky but admissible evidence." *Daubert,* 509 U.S. at 596. Rule 702 does not "require anything approaching absolute certainty." *Daniels*, 291 F. Supp. 3d at 840 (quoting *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 671–72 (6th Cir. 2010)).

## IV.    ANALYSIS

As an initial matter, during the hearing, the parties agreed that certain motions were moot. For instance, with respect to Plaintiff's Motion in Limine to Exclude Richard Green [Doc. 75], Plaintiff stated that Green's testimony is irrelevant.  Defendants stated that they retained Green because it appeared that Plaintiff was claiming as damages the costs of rebuilding the building. Defendants stated if Plaintiff is simply claiming the leasehold improvements, which is $5,000, then Defendants would withdraw Green as an expert.  Plaintiff stated that his claim for leasehold improvements is just $5,000.  Accordingly, Plaintiff's Motion and Supplemented Motion [**Docs. 74, 75**] are **DENIED AS MOOT.**

In addition, the parties announced that they reached an agreement with respect to Defendants' Motion in Limine to Exclude Scott Huggins and Kenneth Boatman [Doc. 92].  The parties agreed that Plaintiff will not rely on Scott Huggins and that Kenneth Boatman will only offer factual testimony and will not be referred to as an expert.  Accordingly, Defendants' Motion in Limine to Exclude Scott Huggins and Kenneth Boatman [**Doc. 92**] is **DENIED AS MOOT.**

Finally, Defendants withdrew their Motion to Strike Tim Dunn's Expert Reports [Doc. 98]. The parties explained that only Boatman performed testing, and therefore, the parties will depose Boatman on such testing.  Accordingly, Defendants' Motion to Strike Tim Dunn's Expert Reports [**Doc. 98**] is **DENIED AS MOOT.**

The Court will now turn to the remaining Motions and address them in the order in which they were filed.[5]

## A.      Plaintiff's Motion in Limine to Exclude Terry Orr

Terry Orr ("Orr") is a Certified Public Account ("CPA"), who Defendants retained to investigate and analyze Plaintiff's lost profits.  In Orr's expert report, he summarizes his opinions as follows:

> The Goins Submission should not be relied upon as it: i) fails to conclude or render an expert opinion on the lost profits Mr. Goins believes are appropriate, ii) lacks and introduction of Mr. Goins'[s] professional experience with matters of economic damages, iii) lacks a historical overview of the Company necessary to estimate damages (if any), iv) lacks an explanation of underlying damages methodology utilized; and v) lacks basic supporting documentation.

[*Id.* at 72-3 at 5].  He further opines that the Goins Submission does not meet the standards of an expert opinion.  [*Id.*].  He states that Goins does not provide his professional experience and that he failed to provide a historical overview of the company.  [*Id.* at 6].  He further explains that the Goins Submission lacks an explanation of the damages' methodology and supporting documentation.  [*Id.* at 6-8].  He concludes that the Goins Submission is materially flawed and that in his opinion, it is unsupported and unreliable.  [*Id.* at 9].

---

[5] In Defendants' responses to Plaintiff's Motions in Limine, Defendants argue that a motion in limine is not the proper mechanism to exclude entire reports and that such rulings are advisory and may be reversed later.  The Court finds all the Motions, including Defendants', are proper and were required to be filed pursuant to the Scheduling Order in this case.  *See* [Doc. 16 at 3]; *see also Travelers Indem. Co. v. Indus. Paper & Packaging Corp.*, No. CIV.A. 3:02-CV-491, 2006 WL 2050686, at *8 (E.D. Tenn. July 19, 2006) ("The proper procedure to oppose or dispute the testimony of an expert is by filing a motion in limine to exclude expert testimony (motion for a *Daubert* hearing) in accordance with the scheduling order.").  The Court may reserve ruling on the Motions, but the Court finds it has sufficient information to adjudicate the Motions at this time, unless otherwise noted.

Plaintiff argues that Orr's opinions should be excluded because he testifies as to the Court's gatekeeping role and the admissibility of expert testimony. Plaintiff asserts that Orr's testimony will not assist the jury and his opinions constitute legal conclusions. Defendants respond that Orr opines on Goins's opinions, which are unreliable and irrelevant. Defendants argue that Orr does not opine on the admissibility of Goins's opinions.

During the hearing, Plaintiff argued that his primary objection is that Orr's report is full of legal conclusions and that Defendants are using Orr to cross examine Goins. Defendants stated that accounting principles are difficult to understand and that they need an expert to explain the deficiencies in Goins's report. Defendants argued that striking his entire testimony is not necessary and that Orr would not use the words "unreliable" or "expert report."

The Court finds Plaintiff's arguments well taken, in part. While Orr is allowed to explain to the jury why he believes Goins's expert report is deficient as proper rebuttal testimony, he cannot testify that Goins fails to render an expert opinion, fails to meet the standards of an expert opinion, or his methods are unreliable. *United States v. Melcher*, 672 F. App'x 547, 552 (6th Cir. 2016) ("Rule 702 prohibits expert witnesses from testifying to legal conclusions."). Further, Plaintiff argues that Orr's testimony will simply constitute a cross examination of Goins's opinions. Orr, however, is a rebuttal expert. "A number of other district courts have held that rebuttal expert witnesses may criticize other experts' theories and calculations without offering alternatives." *Aviva Sports, Inc. v. Fingerhut Direct Mktg., Inc.*, 829 F. Supp. 2d 802, 834 (D. Minn. 2011) (string citing cases). Accordingly, Plaintiff's Motion in Limine to Exclude Terry Orr [**Doc. 72**] is **GRANTED IN PART.** Orr may explain to the jury why he believes Goins's opinions are incorrect or deficient, but Orr may not render legal conclusions as set forth above.

**B.     Plaintiff's Motion in Limine to Exclude Tracey Bellamy**

Tracey Bellamy ("Bellamy") is the Chief Engineering Officer for Telgian Corporation. [Doc. 83-1 at 11].  Defendants retained Bellamy to investigate and analyze whether the alleged drilling by the Comcast Technician into the metal siding of Boatman Automotive constituted "hot work" under NFPA 51b.  In his expert report, Bellamy focuses on three questions:  (1) what is the applicable standard of care for hot work in Tennessee; (2) does drilling of sheet metal constitute "hot work" as defined by the applicable standard of care, and (3) who is responsible for the control of hot work activities within a facility.  [Doc. 83-3].  Bellamy further states:

> IFC, Chapter 80 includes a complete list of referenced standards that are included as a referenced part of the mandated provisions of the Fire Code. A review of the various referenced NFPA Standards reveals that NFPA 51B is not one of the various cited mandated standards. Rather, the IFC includes a separate Chapter 35 entitled *Welding and Other Hot Work*. As a result, the provisions of IFC, Chapter 35 would form the legally mandated standard of care for "Hot Work" and not NFPA 51B in the State of Tennessee.

He renders the following conclusions:

> 1.  The legally mandated standard of care for control of "hot work" activities in the State of Tennessee is established by the State Fire Marshal and includes Chapter 35 of the International Fire Code (2012 Edition).
>
> 2.  The alleged drilling of the metal siding installed at the subject facility would not be sufficient to rise to the level of "hot work" under the provisions of both IFC, Chapter 35, and NFPA 51B nor would it have represented an ignition hazard to the facility.
>
> 3.  The Plaintiff should have been aware of necessary "hot work" permits and establishment of necessary precautions for "hot work" and should have protested upon discovery of any work being conducted contrary to such and taken necessary actions to address resultant hazards.

[Doc. 83-2 at 5].

Plaintiff argues that Bellamy's opinions are irrelevant because he proposes to testify as to the law.  Further, Plaintiff argues that Bellamy's opinion that Plaintiff is responsible is irrelevant because Defendants withdrew their comparative fault defense.  In addition, Plaintiff argues that Bellamy's testimony is cumulative.

Defendants argue that Plaintiff has also offered an expert on the applicable standard of care, Tim Dunn.  Defendants state that Bellamy discusses the factual basis for his opinions and that Bellamy is offered to rebut Dunn.[6]

The Court finds that portions of Bellamy's expert report constitute impermissible legal conclusions.  For instance, with respect to Bellamy's third opinion, the Court finds that this opinion simply instructs the jury that the incident was Plaintiff's fault.  Bellamy may testify as to what is required under the International Fire Code or NFPA 51B, but he may not opine that it was Plaintiff's duty to oversee the hot work.  Further, the Court finds that this opinion is irrelevant as Defendants are not relying on a comparative fault defense.  Thus, the Court hereby **STRIKES** Bellamy's third opinion.

---

[6] Defendants also assert that Plaintiff did not take Bellamy's deposition, and therefore, Plaintiff's assertion that Bellamy's testimony is improper is not based on actual testimony or statements.  Defendants state that at trial, Bellamy will provide in-depth testimony to explain to the jury his understanding of the facts of the case and the basis and the reasons for his opinions. Plaintiff argues that the Federal Rules of Civil Procedure require disclosure of all the opinions of the expert and the basis and reasons for them.  Plaintiff states that he is entitled to rely on the expert report and that the failure to disclose any opinions constitutes a basis to exclude them.

Rule 26(a)(2)(B) requires that the expert report contain "a complete statement of all opinions that the witness will express and the basis and reasons for them."  The Sixth Circuit has noted, however, that this Rule "does not limit an expert's testimony simply to reading his report. No language in the rule would suggest such a limitation. The rule contemplates that the expert will supplement, elaborate upon, explain and subject himself to cross-examination upon his report." *Thompson v. Doane Pet Care Co.,* 470 F.3d 1201, 1203 (6th Cir. 2006).  Thus, while Bellamy may supplement, elaborate, and explain his opinions, he may not offer new opinions or new reasons for his opinions.  If Bellamy impermissibly exceeds the information that is contained in his report, Plaintiff may object at trial.

The Court finds Bellamy's first and second opinions do not constitute impermissible legal conclusions. His first opinion simply serves to rebut Dunn's testimony (and the allegations in the Amended Complaint) that the NFPA 51B is applicable. *See Tolliver v. Tellico Vill. Prop. Owners Ass'n, Inc.*, 579 S.W.3d 8, 21–22 (Tenn. Ct. App. 2019) (allowing expert testimony on the standard of care when negligence is "not obvious and readily understandable by an average layperson") (other citations omitted).

Further, Plaintiff argues that Bellamy's opinions are cumulative of Dr. Hoffman and Dr. Deatherage's opinions. While there does appear to be some overlap in their proposed testimonies with respect to whether the NFPA 51B applies in this case, it appears to the undersigned that Bellamy generally provides opinions with respect to regulations and the NFPA 51B, while Dr. Hoffman and Dr. Deatherage focused on testing to determine whether the drilling that allegedly took place in this case could constitute hot work under the NFPA 51B. At this time, the Court will not exclude or limit his opinions for being cumulative, but if his testimony because unduly cumulative during trial, Plaintiff may object. Accordingly, Plaintiff's Motion in Limine to Exclude Tracey Bellamy [**Doc. 83**] is **GRANTED IN PART.**

### C.    Plaintiff's Motion in Limine to Exclude Harold Deatherage and Donald Hoffman [Doc. 85]

Harold Deatherage, Ph.D., ("Dr. Deatherage") is a consulting engineer with Construction Engineering Consultants and a Professor Emeritus in the Department of Civil and Environmental Engineering at the University of Tennessee. [Doc. 85-1 at 7]. Defendants retained Dr. Deatherage to provide opinions related to Defendants' means and methods to install upgraded cable, internet, and phone services to Plaintiff's facility. [*Id.*]. In his report, Dr. Deatherage concludes as follows:

> The results of testing of the actual sheet metal siding from the
> Boatman Automotive facility were comparable to those performed
> on sheet metal of similar thickness. However, the CEC test data

would indicate that the probability of exceeding 400°F for the actual sheet metal siding is 2.05 X $10^{-26}$, significantly less than previous testing on exemplar sheet metal. Therefore, as noted in the previous report, it is not likely that expanding the hole size in the sheet metal siding of the Boatman Automotive facility by drilling would generate enough heat to start a fire.

[Doc. 85-4 at 2].

As mentioned above, Dr. Hoffman is a senior scientist with Safety Engineering Laboratories, Inc., a professional engineer, and a certified fire investigator. [*Id.* at 9]. Defendants retained Dr. Hoffman to perform a scientific and engineering analysis of the fire. [*Id.*].

Plaintiff states that both expert witnesses produced videos of the testing and experiments, but the tests and experiments were not substantially similar to the conditions of the incident.

"[W]hen an expert conducts testing which 'purports to replicate actual events, the proponent of the evidence must show that the replication and the experiment are substantially similar. The closer the experimental evidence simulates actual events rather than demonstrates a scientific principle, the higher the foundational standard: the experiment and event must be sufficiently similar to provide a fair comparison.'" *Jackson v. E-Z-GO Div. of Textron, Inc.*, 326 F. Supp. 3d 375, 405–06 (W.D. Ky. 2018) (quoting *Dortch v. Fowler*, No. 305-CV-216-JDM, 2007 WL 1794940, at *1 (W.D. Ky. June 15, 2007)).

Plaintiff argues that the experts' tests were not substantially similar to the event because the sheet metal was different, the drill bits were different, the experts did not conduct the drilling for the proper amount of time, the testing did not take into account the ambient temperature and its effect on the sheet metal siding, and Dr. Deatherage did not drill from the proper position when testing. Plaintiff states that Dr. Hoffman's and Dr. Deatherage's testimony will not assist the jury because their tests were not substantially similar to the actual condition.

The Court has considered Plaintiff's objections but finds that they are better suited for cross examination. During the *Daubert* hearing, Dr. Hoffman explained that he did not use the siding from Plaintiff's building because there was not enough to test. With respect to the material, he explained that he used a 26-gauge siding attached to a wood frame. He then placed a target of paper underneath the siding and proceeded to drill multiple holes using a thermal imaging camera to demonstrate that the drilling of the steel siding would not produce particles that could ignite. He explained that the 26-gauge siding is consistent with the 26-gauge steel on the building that he measured during the artifact inspection. Further, Dr. Hoffman testified that he drilled through metal, insulation, and a wood board. Although he did not drill through an OSB board, he explained that the drill bit does not get anywhere near the temperature needed to ignite and no one can testify as to how the drilling was actually performed.[7]

With respect to the size of the drill bit, Dr. Hoffman testified that he used a larger drill bit to generate more heat. He further testified that the diameter of the drill bit does not materially impact the testing and that a bigger drill bit only created a fifteen-degree temperature difference, which is insufficient to generate the heat needed to start a fire. He further testified that ambient temperatures of the testing area did not impact his determination that drilling was not a competent ignition source. He explained, "Commonly what we do for ambient temperatures is we can take Delta, which means if you're ten degrees higher, you add ten degrees to your results. It's the same result. If it's ten degrees lower than what you tested at, you subtract ten degrees. In any case, we're hundreds of degrees off, not tens of degrees, so it doesn't matter."

---

[7] Plaintiff argues that Sammy Dyer testified that he heard Hearn drilling for ten, twelve, to fifteen minutes, but it was not continuous drilling. Plaintiff may cross examine Dr. Hoffman with Dyer's testimony, but Dyer's testimony is not a basis to exclude Dr. Hoffman, who opines that Dyer's testimony is inconsistent with the evidence. Such factual questions are for the jury to decide.

With respect to the sharpness of the drill bit, Dr. Hoffman stated that he took that into consideration and that a sharper drill bit generates additional and larger wood particles. Dr. Hoffman stated that the testing was done using a worst case scenario design. Further, he testified that the longer someone drills, the more heat and friction it creates; however, there are limits on the temperature that can be generated. He stated that the purpose of the testing was to determine such limits. He testified that he did not drill for five to fifteen minutes because such a drilling time was inconsistent with the physical evidence. He determined that drilling was not a competent thermal source.

Dr. Deatherage also sufficiently explained why his testing was not identical to the actual event. He used cold-rolled steel to drill because it has a similar thickness to the sample siding, and his choice only benefits Plaintiff because cold-rolled steel is more resilient than the sample siding from Boatman Automotive. [Doc. 111-1 at 5]. With respect to the position of the drill during testing, Dr. Deatherage explained that vertical positioning was selected for several reasons: (1) because the vertical positioning allowed for greater control over the amount of pressure being applied to the drill; (2) because the limitations for the amount of pressure that can be safely applied while on a ladder (25 lbs); and (3) there is no scientific significance between testing vertically or horizontally. [Doc. 111-1 at 8]. Dr. Deatherage concludes that his use of alternative materials produced more conservative results. [*Id.* at 10].

Further, Dr. Deatherage also explains that Plaintiff's assertion that Hearn drilled for five to fifteen minutes is not plausible as drilling shows it only takes a few seconds to drill through the material. [*Id.*]. Dr. Deatherage also used the same sized drill bits issued to Comcast technicians, and he used sharp and dull drill bits. [*Id*. at 7-8]. He further states that testing shows a marked decrease in temperature when the dull drill bits were used. [*Id*. at 7].

As explained above, the experiments do not have to be identical to the actual condition. *United States v. Baldwin*, 418 F.3d 575, 580 (6th Cir. 2005). "Where the conditions are substantially similar, 'dissimilarities affect the weight of the evidence, not its admissibility.'" *Id.* (quoting *Persian Galleries, Inc. v. Transcon. Ins. Co.,* 38 F.3d 253, 258 (6th Cir. 1994)) (citation and quotation marks omitted). The Court finds that Dr. Hoffman and Dr. Deatherage have sufficiently explained their tests and the choices they made for their tests, and the Court does not find that their tests are too dissimilar from the actual event. Plaintiff's criticisms of their tests can be vigorously pursued through cross examination. Accordingly, Plaintiff's Motion in Limine to Exclude Harold Deatherage and Donald Hoffman [**Doc. 85**] is **DENIED**.

### D.     Defendant's Motion in Limine to Exclude Roger Goins [Doc. 90]

As mentioned above, Roger Goins ("Goins") is a CPA, who Plaintiff retained to provide an opinion on damages, including future loss profits. Specifically, Goins concludes that the net adjusted loss from the fire is $100, 253. [Doc. 90-3 at 3]. He then makes projections that had there been no fire, Plaintiff's revenue would have increased within the range of $31,191 (2%) and $37,228 (5%). [*Id.*].

Defendants argue that Goins opinions are unreliable and that he relied exclusively on information Plaintiff provided him. Defendants assert that he did not audit any of Plaintiff's records, which strongly suggests his opinions are inaccurate. Defendants state that Goins did not verify the costs of goods sold and that there are discrepancies between the internal financial statements used by Goins to project future losses and tax returns filed by the business.

Plaintiff responds that Goins relied upon his knowledge of Plaintiff's business operations, financial statements, tax preparation services rendered to Plaintiff, and interviews with Plaintiff and his daughter. Plaintiff states that in addition to his accounting experience, Goins is uniquely

positioned to express opinions relating to Plaintiff's economic losses due to his personal knowledge and experience with Plaintiff's business operations as a result of the tax preparation work performed and as a customer of Boatman Automotive.

The Court finds Defendants' objections go to the weight of Goins's opinions, rather than to their admissibility. Defendants object that Goins relied exclusively on information that Plaintiff provided him. Goins, however, did not rely exclusively on the information Plaintiff provided him. Goins explained that he has worked as Plaintiff's CPA for years, preparing the tax returns; he relied upon his experience and knowledge in working for small businesses; and he relied on the information Plaintiff provided him. Furthermore, as Goins stated during the hearing, Plaintiff is the source of information given that Boatman Automotive is a sole proprietorship. Defendants argue that Goins relied on Plaintiff to determine whether certain expenses were business or personal. Goins testified that Plaintiff's daughter created a schedule of such items and that Goins removed such items. To the extent that Goins relied on Plaintiff (or his daughter to remove such expenses), Defendants may cross examine Goins at trial. *See also Andler v. Clear Channel Broad., Inc.*, 670 F.3d 717, 729 (6th Cir. 2012) (explaining that courts do not strike an expert opinion "merely because the factual basis for the expert's opinion are weak") (quotation marks and citations omitted). Defendants object that Goins relied on information from Plaintiff in calculating the 2% to 5% growth rate, but he testified that he performed analytical work on various companies to determine the appropriate growth rate.

Finally, Defendants argue that there was a discrepancy between Boatman Automotive's 2015 gross income and the 2016 tax return. Goins testified that when he was processing the information for this case, he came to realize that the 2016 tax return was not accurate. He explained that he has used the sales tax returns instead of the profit and loss statements. He further testified

that he and Plaintiff were going to amend the 2016 tax return, but they were not required to do so. He testified that he used the correct profit and loss calculations in rendering his conclusions in this case. Accordingly, the Court finds Defendants' arguments not well taken, and their Motion in Limine to Exclude Roger Goins [**Doc. 90**] is **DENIED**.

### E. Defendant's Motion in Limine to Exclude Carl Lundin [Doc. 94]

As mentioned above, Dr. Lundin is a professor of metallurgy at the University of Tennessee, who Plaintiff retained to provide an opinion as to whether drilling occurred on the outside steel-sheeting wall from Plaintiff's business. Later, Dr. Lundin served a rebuttal report [Doc. 94-4], concluding as follows:

> [T]he damage to the subject door was strongly influenced by temperature and the loading of the doorframe caused by heating conditions interior to the building during the fire, causing the door to be breached by the conditions inherent with the fire and that the door was not breached from the outside before the fire started. Furthermore, the doorframe deformation was caused by the nature of the fire and the softening of the steel components inherent with the temperature increase.

[*Id.* at 5].

Defendants do not seek to strike Dr. Lundin's opinion that drilling occurred. Instead, Defendants seek to exclude Dr. Lundin's opinion regarding the lock and hasp that secured the office door. Defendants argue that Dr. Lundin's opinions regarding the door are purely speculative. Defendants assert that Dr. Lundin has no independent knowledge of the temperature inside Boatman Automotive during the fire. Further, Defendants assert that Dr. Lundin's opinions as to the loading caused by the failure of the building is based on speculation and exceeds Dr. Lundin's area of expertise. Defendants state that Dr. Lundin did not perform any testing to determine the load that was placed on the door and frame as a result of the steel and he has no information as to the make, manufacturing process, or weight of the beams. In addition,

Defendants argue that Dr. Lundin did not make any calculations to test his beliefs, and therefore, his opinions as to the loading experienced by the door should be struck.

The Court will first address Defendants' challenges to Dr. Lundin's qualifications. Dr. Lundin testified that metallurgy is the "science of a material which is metallic in nature and it involves the properties of the material, the composition, either hot working or mechanical working changes that it has undergone. Anything to do with how material will perform in service after it has been designed in that manner." [Doc. 94-5 at 3]. He continued that it is the science of measuring how metal performs under stressors. [*Id.*]. Further, he explained at the *Daubert* hearing, with respect to the material sciences, the heart and substance of his work is to examine load factors, tensile strength, and how heat or cold affects the properties of such material. He also stated that he regularly looks at loading factors. Given Dr. Lundin's experience, the Court finds he is qualified to offer his second opinion.

Further, Defendants argue that Dr. Lundin has no independent knowledge of the temperature inside the building, the failure of the building is based on speculation, and that he failed to perform any testing or calculations.

The Court finds Defendants' criticisms better suited for cross examination. In rendering his opinions, Dr. Lundin relied upon the following: (1) inspections of the subject door, door frame, hasp, and the padlock; (2) inspection of the sheet metal, siding, cables, and drill bit; (3) review of depositions; (4) discussion with Tim Dunn; (5) interviews with Plaintiff; (6) review of the photographs; (7) review of literature; and (8) his experience and knowledge. Defendants argue that he relied on Tim Dunn's opinion with respect to the temperature, but Dr. Lundin also relied on his knowledge and observations. He explained that Dunn's opinion was consistent with what

he (Dr. Lundin observed) in the photographs. He also utilized articles relating to materials' strength at certain temperatures.

Defendants argue that Dr. Lundin did not perform any tests to determine the load that was placed on the door and the frame as a result of the steel and he did not make any calculations. Further, Defendants argue that Dr. Lundin did not test the hasp to determine whether the hasp had unwrapped as a result of the fire. The factors outlined in *Daubert*, however, are not a definitive checklist. Several courts have explained that the failure to test is not an automatic bar to providing expert testimony. *Clark v. Chrysler Corp.*, 310 F.3d 461, 467 (6th Cir. 2002) ("*Daubert* does not require an expert to come in and actually perform tests in any given situation"); *AmGuard Ins. Co. v. Fire Sys. of Michigan, Inc.,* No. 18-11952, 2019 WL 3456809, at *4 (E.D. Mich. July 31, 2019) ("physical testing of a hypothesis is not a requirement for reliability"). With respect to the lack of any calculations, the Court finds this objection goes to the weight of Dr. Lundin's testimony and not to its admissibility. Defendants may cross examine Dr. Lundin on this issue. Accordingly, the Court **DENIES** Defendants' Motion in Limine to Exclude Carl Lundin [**Doc. 94**].

### F. Defendants' Motion in Limine to Exclude Tim Dunn [Doc. 96]

As mentioned above, Tim Dunn ("Dunn") is a professional engineer and a certified fire and explosion investigator, retained by Plaintiff. Dunn opines that the fire in Boatman Automotive likely started in the upstairs storage closet above the office and was the result of hot work associated with the RG-11 cable installation by the Comcast technician. [Doc. 96-3 at 8].

Defendants object to Dunn's testimony on several grounds. First, Defendants argue that Dunn's cause and origin opinion is based on the absence of evidence. Defendants state that pursuant to the NFPA, there are four sources of data and information that can be used to determine the origin of the fire: (1) notation of the location of electrical activity or arc mapping; (2)

interpretation of fire patterns; (3) analysis of fire dynamics; and (4) consideration of witness statements. Defendants argue that Dunn did not perform arc mapping and that in failing to consider evidence of arc mapping, he failed to consider alternative hypothesis for the fire, which the NFPA states is a "serious error." [Doc. 97 at 17]. Defendants argue that Dunn did not rely upon any of these sources when developing his opinion on the cause and origin of the fire.

With respect to the lack of arc mapping, Dunn testified that he found no signs of electrical arcing, which was also consistent with Captain Whitaker's and Anthony Fultz's opinions that the cause of the fire was not electrical. *See Walter v. Auto-Owners Mut. Ins. Co.*, No. 3:15-CV-535-TAV-DCP, 2018 WL 3650284, at *15 (E.D. Tenn. Aug. 1, 2018) ("Although following NFPA 921 indicates the reliability of an investigator's methods, a departure from the document's guidelines is not necessarily in and of itself grounds for automatic disqualification." (quoting *Travelers Cas. Ins. Co. v. Volunteers of Am. Ky., Inc.*, No. 5:10-301-KKC, 2012 WL 3610250, at *3 (E.D. Ky. Aug. 21, 2012)) (other citations omitted). Defendants argue that Dunn acknowledged that there was electrical arcing at the junction box, but Defendants can cross examine Dunn on this issue. Defendants argue that Dunn failed to consider alternative hypothesis for the fire, but the Court disagrees. Dunn explained that he examined whether the fire could have been caused by lightning, and he also considered accelerants. Further, Defendants state that Dunn did not to reconstruct the area of fire damage as best as possible because he did not look at the fencing around the building. The fire damage was to the building, which Dunn inspected, and Defendants may cross examine Dunn on why he did not examine the fencing around the building.

Defendants further argue that Dunn's opinion is full of negative inferences and not actual data. Defendants point to Dunn's testimony that the lack of damages to certain areas in the building made him conclude that the origin of the fire was not located around such areas. Dunn's

observation that there was no damage on certain items is collecting actual data. Defendants further argue that Dunn failed to consider witness statements. Dunn testified, however, that he did discuss the events with several firefighters, and he also interviewed Plaintiff and Plaintiff's daughter. Defendants state that Dunn did not ask the witnesses pertinent questions, but Defendants may cross examine Dunn on what he did, or did not, ask the witnesses. Defendants argue that Dunn should have asked the firefighters whether the second floor was still in place when they arrived, but Dunn testified that what he gathered from the witnesses' interviews was that there was no collapse of the breakroom. If Defendants have evidence of such, they may present such evidence at the trial for the jury to weigh and consider.

Further, Defendants argue that Dunn did not perform any testing to determine if the actions of Hearn could have started the fire. As other courts have explained, however, "Expert testimony has been held to be consistent with NFPA 921 and satisfy *Daubert* without independent testing." *Walter,* 2018 WL 3650284, at *17 (E.D. Tenn. Aug. 1, 2018) (citing *Erie Ins. Co. v. Sunbeam Prod., Inc.*, No. 2:12-CV-00703, 2015 WL 127894, at *7 (S.D. Ohio Jan. 8, 2015) (stating that although the expert "did not perform physical experiments to test his hypothesis, NFPA 921 specifically provides that testing is done by the principle of deductive reasoning"); *Travelers Indem. Co.*, 2006 WL 1788967, at *4 (permitting an expert fire investigator to testify without performing physical testing); *McCoy v. Whirlpool Corp.*, No. Civ.A 02-2064, 2003 WL 1923016, at *3–4 (D. Kan. Apr. 21, 2003) (stating that "independent testing is not the *sine qua non* of admissible under *Daubert*"); *Donegal Mut. Ins. v. White Consolidated Ins.*, 852 N.E.2d 215, 225 (Ohio Ct. App. 2006) (disagreeing with defendant's argument that the expert's lack of testing the hypothesis rendered the opinion inadmissible).

Defendants argue that Dunn lacks the necessary qualifications to offer any opinions on the applicability of NFPA 51B. Defendants state that Dunn testified that he did not know if the NFPA 51B has been adopted by Tennessee and he did not perform any testing to determine whether the alleged drilling performed by Hearn is sufficient to qualify as "hot work" under NFPA 51B. Further, they argue that Dunn did not do any statistical or probability analysis to determine the odds of a fire starting in a similar situation. They argue, therefore, he is not qualified to testify whether Hearn's drilling constituted "hot work."

The Court finds Dunn is qualified to testify about the NFPA 51B. As Dunn explained, he is a professional engineer and a certified fire and explosion investigator. Defendants may cross examine Dunn on the applicability of the NFPA 51B in Tennessee. Defendants' other arguments regarding Dunn's qualifications (i.e., Dunn is not qualified to testify that Hearn's drill constitutes "hot work" because Dunn did not test any conclusions or perform a statistical or probability analysis) relates to the reliability of his opinions, not his qualifications. The Court has addressed such arguments above.

Further, Defendants argue that Dunn's opinions regarding what caused the metal hasp to unfurl are not supported by any evidence, data, or testing and that Dunn did not rule out other alternative sources for the damage. The Court finds Defendants may cross examine Dunn on these issues. Finally, Defendants filed a supplemental brief arguing that the parties took the deposition of Rosemary Nichols, the first firefighter to enter the building, who testified that the ceiling was in place when she entered. Defendants state that Dunn testified that if the ceiling was in place, then it would seem more of an office fire, rather than a break room fire. Plaintiff responds that Nichols's testimony is inconsistent with other witnesses' statements and the evidence. The Court agrees with Plaintiff that the jury must hear the above evidence and weigh it accordingly, not the

Court. Defendants later argue that Dunn's failure to obtain Nichols's statement highlights his failure to conduct a complete analysis. Defendants may cross examine Dunn on Nichols's statement at trial. Accordingly, the Court finds Defendants' arguments not well taken, and their Motion in Limine to Exclude Tim Dunn [**Doc. 96**] is **DENIED**.

V.    **CONCLUSION**

Accordingly, for the reasons stated above, the Court FINDS as follows:

(1)  Plaintiff's Motion in Limine to Exclude Terry Orr [**Doc. 72**] is **GRANTED IN PART;**

(2)  Plaintiff's Motion in Limine to Exclude Richard Green and Supplemented Motion [**Docs. 74, 75**] are **DENIED AS MOOT**;

(3)  Plaintiff's Motion in Limine to Exclude Tracey Bellamy [**Doc. 83**] is **GRANTED IN PART**;

(4)  Plaintiff's Motion in limine to Exclude Harold Deatherage and Donald Hoffman [**Doc. 85**] is **DENIED**;

(5)  Defendants' Motion in Limine to Exclude Roger Goins [**Doc. 90**] is **DENIED**;

(6)  Defendants' Motion in Limine to Exclude Scott Huggins and Kenneth Boatman [**Doc. 92**] is **DENIED AS MOOT**;

(7)  Defendants' Motion in Limine to Exclude Carl Lundin [**Doc. 94**] is **DENIED**;

(8)  Defendants' Motion in Limine to Exclude Tim Dunn [**Doc. 96**] is **DENIED**;

(9)  Defendants' Motion in Limine to Strike Dunn's Expert Reports [**Doc. 98**] is **DENIED AS MOOT.**

**IT IS SO ORDERED.**

ENTER:

Bruce Guyton

United States Magistrate Judge